E. F. HIGGINS & CO., INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

E. F. HIGGINS PROFIT-SHARING RETIREMENT TRUST, E. F. HIGGINS, JR., TRUSTEE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5315–79, 5316–79.     Filed August 11, 1980.

*Robert E. Schlusser*, for the petitioners.
*Robert N. Armen*, for the respondent.

OPINION

DAWSON, *Judge:* In these consolidated cases, respondent determined the following deficiencies and additions to tax in the Federal income taxes of petitioners:

E. F. HIGGINS & CO., INC.

DOCKET No. 5315-79

| Year | Deficiency |
| --- | --- |
| 1969 | $11,217.08 |
| 1970 | 7,946.22 |
| 1971 | 9,447.56 |
| 1972 | 7,695.01 |
| 1973 | 5,757.72 |

E. F. HIGGINS PROFIT-SHARING RETIREMENT TRUST

DOCKET No. 5316-79

| | | Additions to tax | |
| --- | --- | --- | --- |
| Year | Deficiency | Sec. 6653(a) | Sec. 6651(a)(1) |
| 1968 | $110.92 | $5.55 | $27.73 |
| 1969 | 222.81 | 11.14 | 55.70 |
| 1970 | 251.06 | 12.55 | 62.77 |

The issues presented for our decision are:

(1) Whether petitioner, in carrying its burden of proof, must establish that the Commissioner's determination that petitioner's contributions to and benefits of its profit-sharing plan discriminated in favor of a prohibited group of employees in violation of section 401(a)(4),[1] was arbitrary or an abuse of discretion;

(2) Whether contributions by the petitioner-employer under its profit-sharing plan discriminated in favor of certain prohibited group employees within the meaning of section 401(a)(4) when compared to contributions made by the employer to pension plans established through collective bargaining for its

---

[1] All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue, unless otherwise indicated.

union employees where the union employees elected to receive a lesser contribution rate;

(3) Whether benefits available under the corporate profit-sharing plan discriminated in favor of certain prohibited group members within the meaning of section 401(a)(4) when compared to benefits available under union pension plans.

These cases were submitted fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulations of facts and attached exhibits are incorporated herein by this reference. The pertinent facts are set forth below.

Petitioner E. F. Higgins & Co., Inc. (Higgins), is a Delaware corporation having its principal office and place of business in Middletown, Del., when its petition was filed herein. Petitioner E. F. Higgins Profit-Sharing Retirement Trust, E. F. Higgins, Jr., trustee (Higgins Trust) is a trust also having its principal office in Middletown, Del. The Higgins Trust was created in conjunction with the adoption by Higgins of the E. F. Higgins Profit-Sharing Retirement Plan (Higgins Plan).

During the years in issue, Higgins was an electrical contractor. All of its non-office and non-management employees were members of the International Brotherhood of Electrical Workers (union employees and IBEW, respectively). Although the number of Higgins' union employees at any one time varied, depending on the number and magnitude of the contracts on which it was then working, its union employees comprised the great majority of its total work force in any year.

Higgins was a member of the National Electrical Contractors' Association (NECA). The IBEW was the sole and exclusive source of Higgins' union employees. All wages and benefits paid by Higgins to its union employees were paid pursuant to contracts entered into as a result of collective bargaining between the Delaware division, Penn-Del-Jersey chapter of the NECA (Contractors' Association), and Local Union No. 313, IBEW (Local 313). Each contract remained in effect for a period of 1 to 2 years.

The basic issue in each collective bargaining session was the journeyman's[2] compensation, which was the total dollar amount

---

[2]A union employee designated as a "journeyman" was one who had been classified as such by the IBEW as a result of having served an apprenticeship, passed an IBEW test, and met certain other IBEW criteria.

of wages and benefits paid to, or with respect to, a journeyman on an hourly basis. The journeyman's total compensation under any contract was collectively bargained for that particular contract alone, independent of the journeyman's total compensation under any prior contract. A journeyman's base rate was the hourly wage paid to a journeyman, exclusive of benefits. The base rate of any union employee other than a journeyman was fixed by adjustments to the journeyman's base rate. Except for apprentices, the benefits of any union employee other than a journeyman were the same percentages of the base rate as that of a journeyman.

Higgins' union employees had two pension funds, one national and one local. Prior to 1966, the National Electrical Benefit Fund (NEBF Pension) had been established through nationwide collective bargaining between the IBEW and the NECA. Effective July 1, 1968, the Delaware division of the Penn-Del-Jersey chapter of NECA—Local Union No. 313, IBEW Pension Plan (Local Pension)—had been established by collective bargaining between the Contractors' Association and Local 313. Once the journeyman's total compensation had been agreed upon in a collective bargaining session, Local 313 independently instructed the Contractors' Association as to what amount of a journeyman's total compensation was to be hourly base rate and what amounts were to be paid for various benefits. Thus, Local 313 determined the percentage of compensation that Higgins contributed to the local pension. The IBEW determined the percentage of compensation that electrical contractors, including Higgins, contributed to the NEBF pension.

The journeyman's total compensation during the period 1968 through 1973 was allocated as set forth in the schedule which follows. In the schedule, the first column shows the first effective date for the allocation, the second column shows the dollar amount allocated to the journeyman's hourly base rate, the third column shows the percentage of the hourly base rate allocated to the NEBF Pension and the dollar equivalent, and the fourth column shows the percentage of the hourly base rate allocable to the Local Pension Fund and the dollar equivalent.

| (1)<br>Date | (2)<br>Base rate | (3)<br>NEBF | (4)<br>Local Pension |
|---|---|---|---|
| 1/1 /68 | $5.40 | 1%—$0.054 | --- |

| 7/1 /68 | $5.47 | 1%— 0.054 | 3%—$0.164 |
| 1/1 /69 | 5.70 | 1%— 0.057 | 3%— 0.176 |
| 6/30/69 | 5.94 | 1%— 0.059 | 3%— 0.178 |
| 1/5 /70 | 6.54 | 1%— 0.065 | 3%— 0.196 |
| 6/29/70 | 7.04 | 1%— 0.070 | 3%— 0.211 |
| 1/4 /71 | 8.04 | 1%— 0.080 | 3%— 0.241 |
| 1/3 /72 | 9.04 | 1%— 0.090 | 3%— 0.271 |
| 1/14/73 | 9.25 | 1%— 0.092 | 3%— 0.277 |

Effective for the calendar year 1966, Higgins adopted a profit-sharing plan for such of its employees as were eligible to participate on December 31, 1966, or thereafter became eligible. Higgins created the Higgins Trust to receive contributions, administer the fund, and distribute benefits to participants under the Higgins Plan. Those employees who were eligible to participate in the Higgins Plan were those who were in the service of Higgins on the initial eligibility date and those thereafter who were normally employed at least 20 hours weekly and 5 months annually, over 21 years of age but not over 65 years of age, and having at least 1 year's continuous service with Higgins. Employees who were covered under a negotiated welfare, vacation, or pension plan to which Higgins made contributions were excluded from participation in the Higgins Plan.

The Higgins Plan provided for contributions of not less than 5 percent of net income before Federal income taxes but not more than 15 percent of participants' compensation. With respect to the calendar years 1968 through 1973, Higgins claimed deductions for contributions made to the Higgins Trust based upon participants' compensation as set out in the schedule below:

| Calendar year | Participants' compensation | Higgins' contribution | Percentage |
|---|---|---|---|
| 1968 | $100,468.33 | $15,000.75 | [1]15 |
| 1969 | 112,440.00 | 16,866.00 | [1]15 |
| 1970 | 138,781.60 | 20,817.24 | 15 |
| 1971 | 151,403.29 | 19,682.43 | 13 |
| 1972 | 121,643.00 | 17,030.02 | 14 |
| 1973 | 166,162.88 | 14,954.67 | 9 |

[1] The deductions claimed on Higgins' 1969 Federal income tax return included the contributions made for both 1968 and 1969, totaling $31,936.25. The stipulations of fact are silent as to the reason for the $69.50 difference between the amount listed on the return and the sum of $15,000.75 and $16,866, which is $31,866.75.

The following schedules, on pages 1035, 1036, and 1037, indicate the compensation dispersion of those employees included in and excluded from the Higgins Plan for the years 1968 through 1970. These schedules are also representative of the compensation dispersion for Higgins employees for the taxable years 1971 through 1973.

The Higgins Plan differed from the two union plans as follows:

## 1. *Vesting Requirements*

Under the Higgins Plan, each participant had a vested and nonforfeitable interest in 20 percent of the amount credited to his or her account at the end of his or her first year in the plan. On the last day of each additional full year of participation, an additional 20 percent of the amount credited to the participant's account became vested. Thus, after 5 full years of participation in the Higgins Plan, the full amount credited to each participant's account became vested and nonforfeitable. The Higgins Plan provided for accelerated vesting in the event of death, severance due to permanent total disability, or retirement at or after age 65. At any of those times, the full amount credited to a participant's account became vested and nonforfeitable.

Under the NEBF Pension, a union employee's pension rights did not vest until after 20 years of covered employment. Years of covered employment were determined by dividing the total number of hours for which contributions were made on the employee's behalf by 1,000, except that the years of covered employment could not exceed the number of calendar years during which contributions were made on the employee's behalf. A union employee lost all credited service if (except for several narrowly defined exceptions) he or she failed to work for at least 300 hours in any calendar year for at least 3 consecutive years.

Under the Local Pension, a union employee's pension rights did not vest until after 15 years of credited service. A year of credited service generally required employment for at least 1,800 hours during a calendar year. A union employee lost all credited service if (except for several narrowly defined exceptions) he or she failed to work at least 450 hours per year for 3 consecutive calendar years, unless the employee had at least 15 years of credited service at the end of the third such calendar year.

## E. F. HIGGINS & CO. PROFIT-SHARING TRUST

Year 1968

| Bracket | Total employees | Number participants in P-S Plan | | | | Number employees excluded by reason of— | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Officer | Share-holder | Super-visor | Other | Part-time | Years served | Age | Union employees |
| 25,000 and over | 4 | 2 | ([1]) | 1 | | | | 1 | |
| 20,000 to 25,000 | 3 | | | | | | | | 3 |
| 15,000 to 20,000 | 8 | | | | | | | | 8 |
| 12,500 to 15,000 | 12 | | | | | | | | 12 |
| 10,000 to 12,500 | 13 | | | | | | | | [2]13 |
| 9,000 to 10,000 | 11 | | | | | | | | 11 |
| 8,000 to 9,000 | 11 | | | | 1 | | | 1 | 9 |
| 7,000 to 8,000 | 13 | | | | | | | | 13 |
| 6,000 to 7,000 | 16 | | | | | | | | 16 |
| 5,000 to 6,000 | 15 | | | | | | | | 15 |
| 3,500 to 5,000 | 39 | | | | | | | | 39 |
| 3,500 and under | 199 | | | | | | | | 199 |
| Totals............ | 344 | 2 | ([1]) | 1 | 1 | 0 | 0 | 2 | 338 |

[1] One officer was also a shareholder.
[2] Includes one employee who was under the Higgins plan during the early part of 1968.

## E. F. HIGGINS & CO. PROFIT-SHARING TRUST

Year 1969

| Bracket | Total employees | Number participants in P-S Plan | | | | Number employees excluded by reason of— | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Officer | Share-holder | Super-visor | Other | Part-time | Years served | Age | Union employees |
| 25,000 and over | 3 | 2 | (1) | 1 | | | | | |
| 20,000 to 25,000 | 0 | | | | | | | | |
| 15,000 to 20,000 | 1 | | | | | | | | 1 |
| 12,500 to 15,000 | 4 | | | | | | | | 4 |
| 10,000 to 12,500 | 8 | | | | 2 | | | | 6 |
| 9,000 to 10,000 | 2 | | | | | | | 1 | 1 |
| 8,000 to 9,000 | 1 | | | | | | | | 1 |
| 7,000 to 8,000 | 2 | | | | | | | | 2 |
| 6,000 to 7,000 | 3 | | | | | | | | 3 |
| 5,000 to 6,000 | 1 | | | | | | | | 1 |
| 3,500 to 5,000 | 9 | | | | | | | | 9 |
| 3,500 and under | 36 | | | | | | | 1 | 35 |
| Totals............ | 70 | 2 | (1) | 1 | 2 | 0 | 0 | 2 | 63 |

[1] One officer was also a shareholder.

## E. F. HIGGINS & CO. PROFIT-SHARING TRUST

Year 1970

| Bracket | Total employees | Number participants in P-S Plan | | | | Number employees excluded by reason of— | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Officer | Share-holder | Super-visor | Other | Part-time | Years served | Age | Union employees |
| 25,000 and over | 3 | 2 | (¹) | 1 | | | | | |
| 20,000 to 25,000 | 0 | | | | | | | | |
| 15,000 to 20,000 | 7 | | | | | | | | 7 |
| 12,500 to 15,000 | 11 | | | | 1 | | | | 10 |
| 10,000 to 12,500 | 5 | | | | 1 | | | | 4 |
| 9,000 to 10,000 | 8 | | | | | | | | 8 |
| 8,000 to 9,000 | 3 | | | | | | | | 3 |
| 7,000 to 8,000 | 2 | | | | | | | | 2 |
| 6,000 to 7,000 | 4 | | | | | | 1 | 1 | 2 |
| 5,000 to 6,000 | 7 | | | | | | 1 | | 6 |
| 3,500 to 5,000 | 17 | | | | | | 1 | | 16 |
| 3,500 and under | 52 | | | | | | 1 | | 51 |
| Totals............ | 119 | 2 | (¹) | 1 | 2 | 0 | 4 | 1 | 109 |

¹One officer was also a shareholder.

## 2. *Amounts*

Under the Higgins Plan, each participant was entitled, at his or her normal retirement date, to receive payment of retirement benefits in the form of annual installments (of as nearly equal amount as could be conveniently determined) payable over a period of 10 years or, at the discretion of the administrator of the Higgins Plan, a lump sum of the amount credited to that participant's account. Additionally, the administrator of the Higgins Plan could, after consultation with the participant, direct the trustee of the Higgins Plan to make payment for retirement purposes in such other form or manner as the administrator should deem for the best interest of participant.

Under the NEBF Pension, the amount of normal retirement benefit for a union employee with at least 20 years of credited service was $36 ($3 per month) for each year of such service.

Under the Local Pension, the normal retirement benefit was $66 per year ($5.50 per month) for each year of credited service.

## 3. *Early Retirement*

Under the Higgins Plan, a participant became entitled to retirement benefits in the event of his or her retirement with the consent of Higgins prior to age 65, except that the vested interest could not exceed the amount normally vested at that time.

Under the NEBF Pension, a union employee who ceased employment prior to the attainment of age 65 but whose pension rights were otherwise vested (by virtue of having 20 years of covered employment) was entitled to receive, commencing at age 65, pension benefits in the amount of $3 per month for each completed year of credited service for which contributions were made on his behalf, less $3 per month for each year, or part thereof, the employee was under the age of 65 at the date his or her employment ceased.

Under the Local Pension, a union employee was entitled to retire prior to the normal retirement age of 65, provided, however, that he or she had attained the age of 55 and had at least 10 years of credited service. Under such circumstances, the early retirement benefit was $66 per year ($5.50 per month) for each year of credited service, reduced by one-half percent for

each month, or fraction thereof, that his or her early retirement date preceded his or her 65th birthday.

### 4. *Preretirement and Postretirement Death Benefits*

Under the Higgins Plan, distribution of a participant's vested interest could occur at a date earlier than the normal retirement date in the event of the participant's death. Upon the death of a participant prior to normal retirement age or prior to the final distribution of any amount remaining to his or her credit at any later date, the participant's vested interest became distributable to his or her beneficiaries in such form and manner as the administrator of the Higgins Plan determined after consultation with the beneficiaries.

Under the NEBF Pension, no provision was made for any preretirement or postretirement death benefits.

Under the Local Pension, the spouse of a deceased union employee was entitled to a preretirement death benefit but only if the employee died (a) after July 1, 1971, (b) after having attained the age of 55 and after having completed at least 10 years of credited service, (c) prior to having attained the age of 65, (d) prior to retirement, and (e) prior to a break in service. Under such circumstances, the surviving spouse was entitled to a monthly income for life equal to the amount such spouse would have received if the employee had retired at his or her date of death under an actuarially reduced joint and survivor annuity benefit. Under the Local Pension, no provision was made for a postretirement death benefit except to the extent that a union employee elected to receive less than the retirement benefit to which he or she was otherwise entitled in favor of a joint and survivor option or 10-year certain option.

### 5. *Disability Retirement*

Under the Higgins Plan, a participant who suffered permanent and total disability became entitled to normal retirement benefits in the manner set forth above.

Under the NEBF Pension, a union employee was entitled to disability benefits, provided that he or she became totally disabled and provided further that he or she had been continuously employed for not less than 20 years. The amount of the disability benefit was $3 per month for each year of covered

employment. However, benefits were paid only after 6 whole calendar months from the date of commencement of total disability. Union employees who ceased employment prior to the attainment of age 65 were not entitled to disability pension benefits regardless of the number of years they had been continuously employed.

Under the Local Pension, a union employee was entitled to a disability benefit, provided, however, that he or she became permanently and totally disabled after completion of at least 10 years of credited service, and provided further that he or she was otherwise eligible for Social Security disability benefits. The amount of the disability benefit was equal to the employee's anticipated normal retirement benefit.

### 6. Severance

Under the Higgins Plan, in the event of severance of employment (other than on account of death, permanent and total disability, or early retirement), the administrator could pay to the participant the sum of his or her vested interest either in a lump sum, over a period of 10 years, or, after consultation with the participant, in such other form or manner as the administrator of the Higgins Plan should deem for the best interest of the participant.

Under the NEBF Pension, only an employee who had been continuously employed (without loss of prior credited service) for not less than 20 years and who ceased employment prior to the age of 65 would retain a vested right to pension benefits.

Under the Local Pension, a union employee who prematurely terminated employment forfeited his or her years of credited service, and, concomitantly, his or her retirement and disability benefits unless he or she had at least 15 years of credited service. If the employee permanently terminated employment with at least 15 years of credited service, he or she was entitled to a retirement benefit, commencing at the normal retirement age of 65, in the amount of $66 per year ($5.50 per month) for each year of credited service.

### 7. Postretirement Employment

Under the Higgins Plan, the normal retirement age was 65 years. However, with the approval of the administrator, a

participant who reached 65 years of age could continue his or her employment with Higgins and nevertheless commence to receive retirement benefits under the Higgins Plan.

Under the NEBF Pension, a retired union employee placed on the pension roll thereby agreed not to perform any electrical work of any kind for compensation.

Under the Local Pension, a retired union employee who became reemployed in the electrical construction industry forfeited all retirement and disability benefits due on or after the first day of such reemployment. If such employee again retired, he or she was not entitled to benefits until the passage of at least 180 days after the subsequent date of retirement.

Petitioners argue that during the years in question, the corporate profit-sharing retirement trust was exempt from taxation, and the corporate employer was entitled to deduct its contributions to the trust it had established for certain of its employees.

Under section 404(a), contributions paid by an employer to or under a profit-sharing plan are not deductible under either section 162 or section 212 alone. If, however, such contributions satisfy the conditions of either section 162 or 212 and also satisfy the requirements set forth in section 404, then the contributions may be deductible under that latter section. Section 404(a)(3) provides in part that contributions paid into a profit-sharing trust not in excess of 15 percent of employees' compensation are deductible if such trust is exempt under section 501(a). Section 501(a) provides in part that "An organization described in * * * section 401(a) shall be exempt from taxation." Section 401(a) establishes the requirements for a "qualified trust."

Section 401(a)(4) provides:

(a) REQUIREMENTS FOR QUALIFICATION.—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

\*      \*      \*      \*      \*      \*      \*

(4) if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees.

These categories of employees, namely officers, shareholders, supervisors, and highly compensated personnel, are sometimes

referred to in the aggregate as the "prohibited group." *Babst Service, Inc. v. Commissioner,* 67 T.C. 131, 136 (1976).

The provisions of section 401(a)(4), which deny the exemption to the trust and, consequently, the deduction under section 404(a) to the employer, were designed:

> In order to insure that stock bonus, pension, or profit-sharing plans are operated for the welfare of employees in general, and to prevent the trust device from being used for the benefit of shareholders, officials, or highly paid employees. * * * [H. Rept. 2333, 77th Cong., 1st Sess. (1942), 1942–2 C.B. 372, 450.]

The absence of any evidence of an intent to siphon off profits to the prohibited group in a manner avoiding taxable income is not determinative. *Pulver Roofing Co. v. Commisioner,* 70 T.C. 1001, 1010 (1978); *Greenwald v. Commissioner,* 366 F.2d 538, 540 (2nd Cir. 1966), affg. as to this issue 44 T.C. 137 (1965); *John Duguid & Sons, Inc. v. United States,* 278 F.Supp. 101, 104 (N.D. N.Y. 1967).

In order to qualify under section 401(a)(4), the Higgins Trust must be part of a plan under which there is no discrimination in contributions or benefits in favor of the prohibited group.[3] Sec. 1.401–4(a)(1), Income Tax Regs. This issue is factual to be determined from all the surrounding facts and circumstances.

Petitioners argue that any variation between the percentage of compensation to the Higgins profit-sharing plan and the percentage of compensation to the two union pension plans was attributable to the control of the union employees over the percentage of their compensation to be contributed to their plans and to their proclivity to elect lesser pension contributions in favor of current wages. Because the purpose of the discrimination provisions is the protection of rank-and-file employees against unfair treatment, petitioners contend that the element of choice on the part of the union employees precludes the treatment of the variation in contributions as discriminatory

---

[3]The parties have stipulated that the Higgins Plan alone did not satisfy the coverage requirements of sec. 401(a)(3)(A) or (B); however, they have agreed that the Higgins Plan, together with the NEBF Pension and the Local Pension, did satisfy the coverage requirements of sec. 401(a)(3)(A) as effective for the entire period relevant to these cases.

For a general discussion of the discrimination area, see "Pension Plans: The Discrimination Concept of Section 401(a)—Its Workings and Effects," 52 Minn. L. Rev. 1198 (1968); H. Dederick, "What Constitutes Discrimination in Pension and Profit-Sharing Plans?", 22 J. Tax. 272 (1965).

within the meaning of section 401(a)(4). Petitioners also contend that respondent has no discretionary authority to determine what constitutes discrimination under section 401(a)(4), and thus they bear no additional burden to show that respondent's determination here is arbitrary or an abuse of discretion.

Respondent argues that both the contributions and benefits provided under the Higgins Plan discriminated in favor of the prohibited group when compared with the contributions and benefits under the two union plans. He further argues that in order for petitioners to carry their burden of proof, they must demonstrate that respondent's determination of discrimination was arbitrary or an abuse of discretion.

The Higgins Plan participants were, for the most part, officers, shareholders, employees whose principal duties consisted in supervising the work of other employees, or highly compensated employees. In 1968, there were only 4 employees out of 344 participating in the Higgins Plan. Of the remaining employees, 338 were excluded because of participation in union pension plans, and 2 because of age. Of the Higgins Plan participants, 75 percent (3 out of 4) were officers, shareholders, supervisory personnel, and highly compensated employees. In 1969, there were only 5 employees out of 70 participating in the Higgins Plan. Of the remaining employees, 63 were excluded because of participation in union pension plans, and 2 because of age. Of the Higgins Plan participants, 60 percent (3 out of 5) were officers, shareholders, supervisory personnel, and highly compensated employees. In 1970, there were only 5 employees out of 119 participating in the Higgins Plan. Of the remaining employees, 109 were excluded because of participation in union pension plans, 1 because of age, and 4 because of the years-of-service requirement. Of the Higgins Plan participants, 60 percent (3 out of 5) were officers, shareholders, supervisory personnel, and highly compensated employees. The parties have stipulated that the compensation dispersion distributions for the years 1968 through 1970 are representative of the compensation of all Higgins employees for the taxable years 1971 through 1973.

In determining whether the contributions under the profit-sharing plan violated the antidiscrimination rules, it is appropriate to compare the percentage of contributions made on behalf

of the Higgins Plan participants with that made on behalf of the NEBF Pension and Local Pension participants,[4] as follows:

PERCENTAGE CONTRIBUTIONS MADE TO
THE VARIOUS PLANS INVOLVED HEREIN

| | | Union | | | | |
| Date | (1)<br>Higgins | (2)<br>NEBF | (3)<br>Local | (4)<br>Combined | (5)<br>Difference | (6)<br>Ratio |
|---|---|---|---|---|---|---|
| 1/1 /68 | 15 | 1 | 0 | 1 | 14 | 15:1 |
| 7/1 /68 | 15 | 1 | 3 | 4 | 11 | 3.75:1 |
| 1/1 /69 | 15 | 1 | 3 | 4 | 11 | 3.75:1 |
| 1/5 /70 | 15 | 1 | 3 | 4 | 11 | 3.75:1 |
| 1/4 /71 | 13 | 1 | 3 | 4 | 9 | 3.25:1 |
| 1/3 /72 | 14 | 1 | 3 | 4 | 10 | 3.50:1 |
| 1/14/73 | 9 | 1 | 3 | 4 | 5 | 2.25:1 |

Column 5 in the above table shows, in absolute terms, that the Higgins Plan participants had 14 percent more of their salaries contributed in the first 6 months of 1968; and 11 percent more in the last 6 months. In 1969 and 1970, the advantage was 11 percent. In 1971, it was 9 percent, and in 1972, it was 10 percent. In 1973, although dropping, it was still a significant 5-percent higher.

Column 6 in the above table shows that the Higgins Plan participants enjoyed, during the years in question, a higher level of compensation contribution, ranging from 15 times the union plans' percentage contribution during the first 6 months of 1968 to 2.25 times the union plans' percentage contribution for 1973. For 1968, the Higgins Plan participants had over an 800-percent advantage. For 1969, the advantage was 275 percent; for 1970, it was 275 percent; for 1971, it was 225 percent; for 1972, it was 250 percent; and for 1973, it was 125 percent.

In their brief, the petitioners do not appear to dispute the

---

[4] An approach more favorable to petitioners would include in the computations Higgins' Social Security (FICA) contributions. *Liberty Machine Works, Inc. v. Commissioner*, 62 T.C. 621 (1974), affd. per curiam 518 F.2d 554 (8th Cir. 1975). They have offered no proof, however, that the plans met the requirements for integration with Social Security under sec. 1.401-3(e), Income Tax Regs. See also Rev. Rul. 69-4, 1969-1 C.B. 118; Rev. Rul. 70-580, 1970-2 C.B. 90; Rev. Rul. 71-446, 1971-2 C.B. 187. We have no precise amounts to calculate the percentage contributions made to the various plans adjusted for Social Security contributions. We have only respondent's estimates of the average upward adjustment to the contribution percentages of the Higgins Plan and the combined union plans, which, expectedly, aid respondent's argument. Because petitioners have not addressed the Social Security adjustments, we will not consider them in reaching our decision.

possibility of discrimination where there are substantial differences in contributions. Relying on Rev. Rul. 56–497, 1956–2 C.B. 284,[5] and *Ryan School Retirement Trust v. Commissioner*, 24 T.C. 127 (1955), they argue, however, that variations in contributions as a percentage of compensation do not result in discrimination under section 401(a)(4) where the variations were attributable to elections of rank-and-file employees to take higher current cash remuneration in preference to larger contributions to their union pension plans.

We disagree. Petitioners' reliance on Rev. Rul. 56–497, *supra*, is misplaced. That ruling concerned whether two employee profit-sharing arrangements, which provided for cash payments for some participants and deferment by funding through a trust of contributions on behalf of other participants, qualified under section 401(a). Under the plans, a portion of each company's profits to be shared was allocated among employees in proportion to the basic annual salaries. Under the plan of M company, each participating employee had the option to have all his share contributed to the profit-sharing plan, or to take it entirely in cash or to divide it equally between contribution and cash. The plan of the N company was the same except no option was permitted for any division between contribution and cash. The ruling then presented a tabulation of various compensation levels, numbers of eligible employees in each level, and numbers of employees electing under the options of their respective companies. The point of the ruling was that, for the purposes of the coverage requirements of section 401(a)(3)[6] and the opera-

---

[5]Rev. Rul. 56–497, 1956–2 C.B. 284 was declared obsolete for plan years beginning after Dec. 31, 1979, by Rev. Rul. 80–16, 1980–3 I.R.B. 6.

[6]SEC. 401(a). REQUIREMENTS FOR QUALIFICATION.—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

    \*       \*       \*       \*       \*       \*       \*

    (3) if the trust, or two or more trusts, or the trust or trusts and annuity plan or plans are designated by the employer as constituting parts of a plan intended to qualify under this subsection which benefits either—

        (A) 70 percent or more of all the employees, or 80 percent or more of all the employees who are eligible to benefit under the plan if 70 percent or more of all the employees are eligible to benefit under the plan, excluding in each case employees who have been employed not more than a minimum period prescribed by the plan, not exceeding 5 years, employees whose customary employment is for not more than 20 hours in any one week, and employees whose customary employment is for not more than 5 months in any calendar year, or

tional requirements of 401(a)(4), there would be an adjustment taking into consideration the numbers of full-share participants and half-share participants. Thus, the Service in resolving the question of discrimination as to coverage and contributions, weighted the number of participants in a trust and considered only that portion of the employer's contribution which was actually contributed to the trust. Rev. Rul. 56–497 is also distinguishable because, although the allocation was in proportion to compensation,[7] the participation percentage was identical for all employees.

A ruling more applicable to petitioners' situation is Rev. Rul. 66–15, 1966–1 C.B. 83.[8] In that ruling, a corporate employer established a profit-sharing plan for the benefit of its 6 full-time salaried employees, excluding 56 hourly paid employees for whom the employer contributed to an industry-wide pension plan under a collective bargaining agreement. The profit-sharing plan permitted contributions not in excess of 15 percent. All of the covered employees were members of the prohibited group. Under the collective bargaining agreement, however, only 4 percent of compensation was allocated to the union pension plan. That ruling, which cross references Rev. Rul. 56–497 on which petitioners rely, holds that the nondiscrimination requirements of section 401(a)(4) were not met and that the profit-sharing plan for salaried employees failed to qualify under section 401(a).[9]

Petitioners interpret our opinion in *Ryan School Retirement Trust v. Commissioner, supra,* as supporting their view that the

---

(B)  such employees as qualify under a classification set up by the employer and found by the Secretary or his delegate not to be discriminatory in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees;

[7] Sec. 401(a)(5) provides in part, "Neither shall a plan be considered discriminatory * * * merely because the contributions or benefits of or on behalf of the employees under the plan bear a uniform relationship to total compensation, or the basic or regular rate of compensation, of such employees."

[8] Rev. Rul. 66–15 was later amplified by Rev. Rul. 70–183, 1970–1 C.B. 103.

[9] It is interesting to note that Rev. Rul. 66–15, *supra,* did not present an insurmountable barrier to the establishment of a profit-sharing plan. One such plan specifically limited the contributions under the profit-sharing plan to the level of contributions under the union plan. *Loper Sheet Metal, Inc. v. Commissioner,* 53 T.C. 385, 388–389 (1969). Unfortunately for the Loper Sheet Metal Co., it did not obey its own plan, and by contributing too much to the profit-sharing plan for the prohibited group, violated the antidiscrimination provisions of sec. 401(a)(4).

Higgins Plan is nondiscriminatory because they had no way of controlling or foreseeing the contribution rate the unions would choose from year to year for their pension plans, and any changes by the unions, either raising or lowering the rate, would not reflect permanent changes in Higgins' business or the composition of its work force. This reasoning is incorrect.

In *Ryan School Retirement Trust*, the Ryan School established a pension trust in 1944 covering all employees—110 rank-and-file and 5 officers. By 1951, because of terminations due to adverse business conditions, the only participants remaining in the plan were the 5 officers and 5 other employees. Because of forfeitures from the accounts of terminated employees which were credited to the accounts of the remaining participants, the 5 officers were credited with 58 percent of the trust fund, and the 5 other employees with only 42 percent. We approved the plan there, which covered *all* employees, because, among other things, the events which caused the drastic reduction in rank-and-file employees, thus skewing the contributions credited in favor of the officer group, were not foreseeable.[10]

In *Bernard McMenamy, Contractor, Inc. v. Commissioner*, 54 T.C. 1057, 1964 (1970), affd. 442 F.2d 359 (8th Cir. 1971), we distinguished *Ryan School Retirement Trust* by stating that, while it was altogether possible that a substantial number of rank-and-file employees at the Ryan School might have remained to derive substantial benefits under that plan, there was discrimination under section 401(a)(4) where the contribution formula adopted for the plan was known at the time of its establishment to favor a prohibited group member against all other plan participants. Such are the circumstances here. Higgins had fair notice of the combined contribution percentage of the union pension plans. Any changes could have been foreseen, and petitioners were in a position to make adjustments in the Higgins Plan contribution formula which would have enabled it to meet the nondiscrimination requirements of section 401(a)(4). Moreover, the plan in *Ryan School Retirement Trust* covered *all* employees while the Higgins Plan covered primarily prohibited group members.[11]

---

[10]*Ryan School Retirement Trust v. Commissioner*, 24 T.C. 127 (1955), concerned the predecessor of sec. 401(a)(4), i.e., sec. 165(a)(4), I.R.C. 1939.

[11]In *Lansons, Inc. v. Commissioner*, 69 T.C. 773, 784–785 (1978), a case concerning sec. 401(a)(3) coverage requirements, we stated that the *Ryan School Retirement Trust* holding had

Courts have considered the effect of rank-and-file employee elections to receive lesser pension contributions in the discrimination area. In *Container Service Co. v. United States*, 345 F. Supp. 235 (S.D. Ohio 1972), affd. per curiam on other grounds 478 F.2d 770 (6th Cir. 1973), the taxpayer, attempting to prove nondiscrimination, argued that the only employees excluded from its corporate profit-sharing plan were union personnel whose compensation and pension benefits were determined by collective bargaining. Because under Federal labor law, pension benefits are a mandatory subject of collective bargaining, the taxpayer-employer could not unilaterally determine to include its union personnel within the coverage of its profit-sharing plan without negotiation with the employees' union. The taxpayer presented evidence from the union's bargaining representative that the union decided to seek increased wages and hospitalization insurance instead of higher pension benefits. The District Court held that, even assuming this were so, it would not require a reversal of the Commissioner's determination that the taxpayer's profit-sharing retirement plan discriminated in favor of the prohibited group. 345 F. Supp. at 240. See also *Loper Sheet Metal, Inc. v. Commissioner*, 53 T.C 385 (1969); *Liberty Machine Works, Inc. v. Commissioner*, 62 T.C. 621 (1974), affd. 518 F.2d

---

been limited in subsequent cases and stood for the narrow proposition that where the purpose and effect of the eligibility requirements in a plan are to avoid the immediate coverage of nonpermanent employees, the classification is not per se discriminatory. See also *Sherwood Swan & Co. v. Commissioner*, 42 T.C. 299 (1964), affd. 352 F.2d 306 (9th Cir. 1965).

In *Pulver Roofing Co. v. Commissioner*, 70 T.C. 1001, 1012 (1978), appeal dismissed (2d Cir. 1979), we said:

"Our concern in *Lansons* was that minor year-to-year fluctuations in coverage due to extraneous factors would result in a plan being qualified in one year and nonqualified in the next, without the slightest change of a permanent nature."

The permanent or transient nature of Higgins' work force is not an issue herein because the discrimination does not involve classification under sec. 401(a)(3)(B) but rather a disparity in contributions under sec. 401(a)(4) between the Higgins Plan and the union plans, a disparity which persists regardless of the relative numbers of employees participating in those plans. Moreover, we note that throughout the entire period relevant to this case, the contributions to the NEBF Pension and the Local Pension remained constant at 1 percent and 3 percent, respectively. The theoretical possibility that the unions could have radically increased or decreased the percentage contributions is not determinative. What is important is that the percentage contributions to the union plans which were actually made throughout the relevant period were not comparable to the percentage contributions made to the Higgins Plan.

554 (8th Cir. 1975); *Peter F. Mitchell Corp. v. Commissioner*, T.C. Memo. 1968–209, supplemental opinion, T.C. Memo. 1969–73.

The District Court in *Container Service Co. v. United States*, congently stated:

In enacting the qualification requirements for pension plans under Section 401 the Congress made a policy decision that tax benefits should be granted only to those pension plans which benefit the welfare of all employees in general. * * * Permitting the taxpayer to take a deduction for contributions to the profit-sharing retirement plan which operates to benefit a limited number of highly compensated managerial personnel would frustrate the congressional policy limiting qualification to profit sharing or pension plans which benefit the welfare of employees in general.

The question of whether an accommodation should be made between the nondiscrimination requirements of Sections 401(a)(3)(B) and 401(a)(4) and the prohibitions of federal labor law against unilateral changes in the terms and conditions of employment so that a small company such as plaintiff, employing primarily hourly paid unionized personnel, can establish a qualified profit sharing plan for its small staff of salaried managerial employees involves questions of national taxing policy which can best be resolved by the Congress and not the federal courts. [345 F. Supp. at 240].

In *Loevsky v. Commissioner*, 55 T.C. 1144, 1151 (1971), this Court said:

The failure to provide for the exclusion of unionized employees in determining whether or not the nondiscrimination requirements of sections 401(a)(3)(B) and 401(a)(4) are met may have been an oversight on the part of Congress, or as is more likely, the failure may be attributable to the fact that problems such as those now before us simply were not foreseeable given the state of the law in the tax and labor areas at the time these provisions were enacted. Furthermore, we realize that the effect of our decision in this regard may be to prevent the employer from establishing a pension or profit-sharing plan for his nonunion personnel. This is especially true of the small business where only a small number of salaried individuals may be required to operate the business for the bulk of the work force being composed of unionized employees.

However, despite the harshness of the result in this case and the potential harshness of the future application of our decision here, it is properly the function of Congress and not this Court to make any appropriate adjustments to the law in this area. * * *

In 1974, as part of a comprehensive revision of the pension and profit-sharing tax laws, Congress ameliorated the harshness of the requirements of sections 401(a)(3) and 401(a)(4) by excluding, under section 410(b)(2)(A), unionized labor from consideration in the percentage test (formerly sec. 401(a)(3)(A), now sec. 410(b)(1)(A)), the classification test (formerly sec. 401(a)(3)(B),

now sec. 410(b)(1)(B)), and the operational test (sec. 401(a)(4) was amended to exclude by reference unionized employees described in section 410(b)(2)(A)).[12]

Given the state of the law for the years in issue, we will apply the plain meaning of the statutory language and the clear indications of congressional intent to the contributions of Higgins to the plans herein. Accordingly, we conclude that the petitioners have failed to prove by a preponderance of the evidence that the economic advantage shown in the differences and ratios between the Higgins Plan and the combined union plans does not discriminate in favor of the prohibited group within the meaning of section 401(a)(4) for the years 1968 through 1973. See, e.g., *Loper Sheet Metal, Inc. v. Commissioner*, 53 T.C. 385 (1969); *Peter F. Mitchell Corp. v. Commissioner*, T.C. Memo. 1968–209; supplemental opinion, T.C. Memo. 1969–73.

Respondent further argues that *Loevsky v. Commissioner*, 55 T.C. 1144 (1971), affd. per curiam 471 F.2d 1178 (3d Cir. 1973), cert. denied 412 U.S. 919 (1973), is authority for the proposition

---

[12]The Employment Retirement Income Security Act of 1974 (ERISA), Pub. L. 93–406, 88 Stat. 829, modified the former sec. 401(a)(3), n. 6 *supra*, to the form it is now as sec. 410(b):

SEC. 410. MINIMUM PARTICIPATION STANDARDS

(b) ELIGIBILITY.—

(1) IN GENERAL.—A trust shall not constitute a qualified trust under section 401(a) unless the trust, or two or more trusts, or the trust or trusts and annuity plan or plans are designated by the employer as constituting parts of a plan intended to qualify under section 401(a) which benefits either—

(A) 70 percent or more of all employees, or 80 percent or more of all the employees who are eligible to benefit under the plan if 70 percent or more of all the employees are eligible to benefit under the plan, excluding in each case employees who have not satisfied the minimum age and service requirements, if any, prescribed by the plan as a condition of participation, or

(B) such employees as qualify under a classification set up by the employer and found by the Secretary not to be discriminatory in favor of employees who are officers, shareholders, or highly compensated.

(2) EXCLUSION OF CERTAIN EMPLOYEES.—For purposes of paragraph (1), there shall be excluded from consideration—

(A) employees not included in the plan who are included in a unit of employees covered by an agreement which the Secretary of Labor finds to be a collective bargaining agreement between employee representatives and one or more employers, if there is evidence that retirement benefits were the subject of good faith bargaining between such employee representatives and such employer or employers,

This new provision was made applicable prospectively. Sec. 1017, Pub. L. 93–406, 88 Stat. 829, 932–935. The relevant legislative history indicates that Congress considered this new provision not in any way declaratory of existing law, but rather a change which eases the application of the provisions of existing law. *Babst Services, Inc. v. Commissioner*, 67 T.C. 131, 141 (1976). H. Rept. 93–807, pp. 48–49 (1974), 1974–3 C.B. (Supp.) 283–284; S. Rept. 93–383, pp. 41–43 (1973), 1974–3 C.B. (Supp.) 120–122.

that a taxpayer, in order to carry its burden of proof, must demonstrate that the Commissioner's determination of discrimination under section 401(a)(4) was arbitrary, unreasonable, or an abuse of discretion. Because many taxpayers may, by succumbing to such an assertion, yield a position to which they would otherwise be legally entitled, we think it is necessary to clarify *Loevsky* in this respect. That case concerned only section 401(a)(3), although it also mentioned section 401(a)(4). We stated therein (55 T.C. at 1149):

In the first instance, this question must be determined by the Commissioner, and his determination should not be overturned unless it is demonstrated to be arbitrary, unreasonable, or an abuse of discretion. *Ed & Jim Fleitz, Inc.*, 50 T.C. 384 (1968).

While the reference to "this question" could be inferred to mean discrimination under section 401(a)(4) as well as under section 401(a)(3), the case cited as authority, *Ed & Jim Fleitz, Inc. v. Commissioner*, 50 T.C. 384 (1968), concerned only section 401(a)(3). There were no specific findings of fact in the *Loevsky* case relating to contributions or benefits upon which this Court could have made a decision under the provisions of section 401(a)(4). Therefore, we regard as dicta the views stated in our *Loevsky* opinion with respect to the burden of proof standard under section 401(a)(4). See the opinion of the Court of Appeals for the Third Circuit in *Loevsky v. Commissioner*, 471 F.2d 1178, which affirmed per curiam our opinion *solely* on the basis of section 401(a)(3)(B). That section, which required that for a trust to qualify for tax exemption, it must benefit such employees as qualify under a nondiscriminatory classification set up by the employer, contains the phrase, "found by the Secretary or his delegate not to be discriminatory." By contrast, section 401(a)(4), which prohibits discrimination in contributions or benefits, contains no such phrase.[13] Thus, although section 401(a)(3)(B)

---

[13]SEC. 401. QUALIFIED PENSION, PROFIT-SHARING, AND STOCK BONUS PLANS.

(a) REQUIREMENTS FOR QUALIFICATION.—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

*     *     *     *     *     *     *

(3) if the trust, or two or more trusts, or the trust or trusts and annuity plan or plans are designated by the employer as constituting parts of a plan intended to qualify under this subsection which benefits either—

*     *     *     *     *     *     *

gives the Secretary of the Treasury or his delegate, the Commissioner of Internal Revenue, the discretionary authority to determine whether the *classification* of a plan is discriminatory, which determination will not be overturned unless it is arbitrary or an abuse of discretion, there is not similar statutory grant or discretionary authority to determine whether the *contributions* or *benefits* of a plan discriminate under section 401(a)(4). Where we have held a plan not violative of section 401(a)(4), we have made no prior finding that the Commissioner was arbitrary or abused his discretion in determining the plan discriminatory with respect to contributions or benefits. See, e.g., *Ryan School Retirement Trust v. Commissioner*, 24 T.C. 127 (1955) (concerned predecessor of sec. 401(a)(4), i.e., sec. 165(a)(4), I.R.C. 1939). *Sherwood Swan & Co. v. Commissioner*, 42 T.C. 299 (1964), affd. 352 F.2d 306 (9th Cir. 1965).

Accordingly, we hold that respondent has no discretionary authority under section 401(a)(4), as he does under section 401(a)(3)(B).[14] Our *Loevsky* opinion is therefore modified to reflect this holding.

We now turn to the issue as to whether the Higgins Plan was comparable in terms of benefits with the NEBF Pension and Local Pension. We conclude that the benefits under the Higgins Plan were significantly superior to the two union pension plans.

### 1. *Vesting Requirements*

Vesting is an important benefit and one which must be considered in reaching a decision as to whether a plan is discriminatory as to benefits. *United States v. Hall*, 398 F.2d 383, 387 (8th Cir. 1968).

The Higgins Plan provided for annual vesting at the rate of 20

---

(B) such employees as qualify under a classification set up by the employer and *found by the Secretary or his delegate* not to be discriminatory in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees;
and

(4) if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees.
[Emphasis added].

[14]This is more important today because sec. 401(a)(3) has been moved and modified by the Employment Retirement Income Security Act of 1974. See n. 12 *supra.*

percent, while permitting accelerated vesting in the event of death, severance due to permanent and total disability, or retirement at or after age 65.

On the other hand, the NEBF Pension provided for vesting only after 20 years of service, with the added condition that a union employee would lose credit for all years of prior service (except for several narrowly defined exceptions) if he or she failed to work for at least 300 hours in any calendar year for 3 or more consecutive years. The NEBF Pension did not provide for an accelerated vesting. The Local Pension provided for vesting only after 15 years of service, with the added condition that a union employee would lose all credited service (except for several narrowly defined exceptions) if he or she failed to work at least 450 hours per year for 3 consecutive calendar years unless the employee had at least 15 years of credited service at the end of the third such year.

## 2. *Amounts*

Pension plans provide for definitely determinable benefits. Profit-sharing plans provide for contributions but do not purport to provide for definitely determinable benefits to be paid upon retirement. *Loper Sheet Metal, Inc. v. Commissioner*, 53 T.C. 385, 391 (1969). Petitioners have offered no evidence as to the benefits payable under the Higgins Plan as a result solely of the contributions made to the trusts during the years at issue. On this point, they have not carried their burden of proof. Rule 142, Tax Court Rules of Practice and Procedure.

## 3. *Early Retirement*

Under all three plans, the normal retirement age was 65 years. Under the Higgins Plan, a participant could retire, with the consent of Higgins, prior to age 65; the participant's vested interest was then distributable.

Under the NEBF Pension, the union employee who had ceased employment prior to the attainment of age 65 and whose pension rights were otherwise vested by virtue of having 20 years of service, was entitled to receive, commencing at age 65, his or her anticipated benefits, subject, however, to reduction for such early termination of employment. Under the Local Pension, a union employee was entitled to retire with reduced benefits

prior to the normal retirement age, provided, however, that he or she had attained the age of 55 and had at least 10 years of service.

### 4. *Preretirement and Postretirement Death Benefits*

The Higgins Plan provided for accelerated vesting in the event of a participant's death with the vested interest becoming distributable to his or her beneficiaries in such form and manner as the administrator of the Higgins Plan determined after consultation with the beneficiaries.

By contrast, the NEBF Pension did not provide for any preretirement death benefit. The Local Pension provided for a preretirement death benefit, but only if the employee-participant died (a) after July 1, 1971, (b) after having attained the age of 55 and after having completed at least 10 years of credited service, (c) prior to having attained the age of 65, (d) prior to retirement, and (e) prior to a break in service. Under such circumstances, the surviving spouse was entitled to a monthly income for life equal to the amount such spouse would have received if the employee-participant had retired by his or her date of death under an actuarially reduced joint and survivor annuity benefit.

Under the Higgins Plan, upon the death of a participant at or after normal retirement age and prior to the final distribution of any amount remaining to his or her credit, the participant's vested interest became distributable to his or her beneficiaries in such form and manner as the administrator of the Higgins Plan determined after consultation with the beneficiaries.

In contradistinction, the NEBF Pension did not provide for any postretirement death benefit. Under the Local Pension, no provision was made for a postretirement death benefit except to the extent that a union employee elected to receive less than the retirement benefit to which he or she was otherwise entitled in favor of a joint and survivor option or a 10-year certain option.

### 5. *Disability ·Retirement*

The Higgins Plan provided for accelerated vesting in the event of permanent and total disability. A participant under the Higgins Plan would be entitled to his or her retirement benefits in the same manner as if he or she had retired at the normal retirement age. By comparison, the NEBF Pension provided for

disability benefits but only in the event that the union employee had been continuously employed for at least 20 years. Benefits were only payable commencing after 6 whole calendar months from the date of commencement of total disability. Union employees who ceased employment prior to the attainment of age 65 were not entitled to any disability benefits regardless of the number of years that they had been continuously employed. Under the Local Pension, a union employee was entitled to a disability benefit, but only if he or she became permanently and totally disabled after completion of at least 10 years of service, and only if he or she was otherwise eligible for disability benefits under Social Security.

## 6. *Severance*

Under the Higgins Plan, in the event of severance, the administrator could pay to the former employee the sum of his or her vested interest either in a lump sum, over a period of 10 years, or in a manner deemed best for the participant.

Under the NEBF Pension, only an employer who had been continuously employed for not less than 20 years and who ceased work prior to the age of 65 would retain any vested right to pension benefits. Under the Local Pension, a union employer who severed employment forfeited his or her years of credited service and consequently his or her retirement and disability benefits, unless he or she had at least 15 years of credited service. In that event, the early terminated employee was entitled to the normal retirement benefits, but commencing only at age 65.

## 7. *Postretirement Employment*

Under the Higgins Plan a participant, having reached the age of 65, could, with the approval of the administrator, continue his or her employment with Higgins and nevertheless begin receiving retirement benefits under the Higgins Plan.

Under the NEBF Pension, however, a retired union employee placed on the pension roll thereby agreed not to perform any electrical work of any kind for compensation. Under the Local Pension, a retired union employee who became reemployed in the electrical construction industry forfeited all retirement and disability benefits due on or after the first day of such reemployment. If such employee again retired, he or she was not

entitled to benefits until the passage of at least 180 days after the subsequent date of retirement.

In view of these significant differences, we think the benefits provided under the Higgins Plan discriminated in favor of employees who were officers, shareholders, supervisory personnel, and highly compensated employees in violation of section 401(a)(4). Therefore, we hold that the Higgins Plan is not qualified under section 401(a).

One final point. The Higgins Trust offered no evidence with respect to the imposition of additions to tax under sections 6653(a) and 6651(a)(1), but agreed with respondent that, if the Court should find the Higgins Plan not to be qualified, the deficiencies and additions to tax set forth in the statutory notice of deficiency issued to the Higgins Trust would be due. We have so found.

To reflect our conclusions on the disputed issues,

*Decision will be entered for the respondent.*

Reviewed by the Court.

NIMS, *J.,* concurring: Because on its face it may appear unreasonable to require comparability between the salaried and union plans, I think it is important to emphasize the significance of the parties' stipulation that the salaried plan, standing alone, does not qualify under section 401(a)(3)(A) or (B).[1] This being the case, petitioner must hope for success by treating the salaried and union plans as a single plan, as permitted under section 1.401–3(f), Income Tax Regs.[2]

While the parties have also stipulated that the three plans, when considered as one, *do* satisfy the coverage requirements of

---

[1] In this connection, see Rev. Rul. 66–12, 1966–1 C.B. 72; Rev. Rul. 68–244, 1968–1 C.B. 158; Rev. Rul. 70–200, 1970–1 C.B. 101; Rev. Rul. 74–255, 1974–1 C.B. 93; Rev. Rul. 74–256, 1974–1 C.B. 94.

[2] Sec. 1.401–3(f), Income Tax Regs., reads as follows:

(f) An employer may designate several trusts or a trust or trusts and an annuity plan or plans as constituting one plan which is intended to qualify under section 401(a)(3), in which case all of such trusts and plans taken as a whole may meet the requirements of such section. The fact that such combination of trusts and plans fails to qualify as one plan does not prevent such of the trusts and plans as qualify from meeting the requirements of section 401(a).

section 401(a)(3)(A) for the entire period, nevertheless the combined plan does *not* qualify under section 401(a)(4), as the Court here holds. Thus the salaried plan, even though it might have passed muster under section 401(a)(4) if considered separately (which petitioner was entitled to have done under applicable regulations and rulings),[3] must still fail because it failed separately under section 401(a)(3).

Accordingly, this case does not present an appropriate opportunity for the Court to give further consideration to the approach taken in the line of cases culminating in *Loevsky v. Commissioner, supra*, and *Babst Services, Inc. v. Commissioner, supra*, even if the Court were inclined to do so at this late date. In any event, as our opinion indicates, Congress in 1974 ameliorated prospectively the harshness of old section 401(a)(3) and section 401(a)(4).

---

[3] See sec. 1.401–4(a)(1)(i), Income Tax Regs.; Rev. Rul. 76–250, 1976–2 C.B. 124, Rev. Rul. 79–348, 1979–2 C.B. 161.