HENRY T. BOGGS AND JEANNE BOGGS, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9743–80.     Filed July 24, 1984.

*James R. Bailes, Charles F. Bagley, Jr.,* and *Howard R.
Crews, Jr.,* for the petitioners.
*Robert J. Kastl,* for the respondent.

PARKER, *Judge:* Respondent determined a deficiency in
petitioners' Federal income tax for the 1976 taxable year in
the amount of $62,183.93. The issues for decision are: (1)
Whether a distribution from a profit-sharing trust is entitled

to be rolled over tax free into an Individual Retirement Account (IRA) under the provisions of section 402(a)(5),[1] and (2) whether petitioners should have reported the $1,850 interest earned by the IRA as taxable income for their 1976 taxable year.

## FINDINGS OF FACT

This case was submitted fully stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioners Henry T. Boggs and Jeanne Boggs were husband and wife during calendar year 1976. They filed a joint Federal income tax return for that year with the Internal Revenue Service Center in Memphis, TN. At the time they filed their petition, petitioner Henry T. Boggs resided in Chesapeake, OH, and petitioner Jeanne Boggs resided in Huntington, WV. Because Jeanne Boggs is a party hereto solely by having filed a joint return, the term "petitioner" in the singular will hereinafter refer only to Henry T. Boggs.

During all the years relevant herein, petitioner was the majority shareholder and chief executive officer of H.T. Boggs Co., Inc. (the company). The company, organized under the laws of West Virginia, operated a sheet metal fabricating and roofing business in the States of Ohio and West Virginia.

On November 12, 1962, the company adopted a profit-sharing plan and trust (hereinafter the trust) which covered all of the company's full-time salaried employees with 2 years of service. The trust provided for nondiscretionary contributions by the company for the benefit of all covered employees of 50 percent of the company's profit in excess of $30,000, but not to exceed 15 percent of each covered employee's compensation. The company and the trust adopted and filed their respective Federal tax returns on a fiscal year basis beginning December 1 and ending November 30 during all years pertinent hereto.

In 1962, when the trust was established, the company had approximately 50 employees. Five of these employees, including petitioner, were salaried employees covered by the trust.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable year in issue.

Two of these salaried employees earned less than $4,000 per year and were not officers, stockholders, or managerial employees. All of the remaining employees of the company in 1962 were union members who were covered under a variety of union negotiated pension plans arrived at as a result of good faith collective bargaining. The company has designated the trust and the union plans as constituting one plan intended to qualify as a single plan under section 401(a).

In December 1962, the company applied for a determination from respondent that the trust was a qualified trust under the provisions of section 401(a) and was exempt from taxation under section 501(a). By letter dated December 23, 1962, respondent determined that the trust was qualified under section 401(a) and exempt under section 501(a).

In 1964, one of the stockholders previously covered by the trust left the company's employment, and one of the salaried employees who had earned less than $4,000 in 1962 became involved in management. In 1968, one additional clerical employee became covered by the trust, and in 1970, one additional management employee became covered. In 1971, three managerial employees who were covered by the trust left the employ of the company and went into direct competition with it. These employees were replaced by three other managerial employees who became covered by the trust in 1973. In 1972, one clerical employee whose interest was fully vested retired, and another voluntarily left the company's employ. In summary, the numbers of salaried employees, by category, covered by the trust during its existence were as follows:

| Year | Officer, shareholder, or supervisor | Other |
|------|-------------------------------------|-------|
| 1962 | 3 | 2 |
| 1964 | 3 | 1 |
| 1968 | 3 | 2 |
| 1970 | 4 | 2 |
| 1971 | 1 | 2 |
| 1972 | 1 | None |
| 1973 | 4 | None |
| 1974 | 4 | None |
| 1975 | 4 | None |
| 1976 | 4 | None |

The extent of employee turnover between 1962 and 1974 was beyond the company's control and could not have been anticipated by the company.

The trust continued in effect without amendment from 1962 until July of 1976, when the company determined that it should be terminated. Upon the trust's termination in 1976, the company had 62 employees, 58 of whom were covered by union plans and 4 of whom were covered by the company's profit-sharing trust. All of the salaried employees who were covered by the trust at the time of its termination were stockholders, officers, or supervisory employees, and were the same individuals covered by the trust in 1974.

During the fiscal year ending November 30, 1974, the company contributed a total of $11,863.17 to the trust. The company made no contributions to the trust for the fiscal years ending in 1975 and 1976. However, the company continued to make contributions to the various pension plans covering its union employees.

The tables shown on pages 136, 137, and 138 indicate the contributions made by the company, including the assigned value of social security contributions[2] on behalf of each of the employees covered by the trust and by the Sheet Metal Workers National Pension Fund, Plan A (hereinafter the pension plan),[3] during the fiscal years 1974, 1975, and 1976.[4]

As of November 30, 1973, petitioner's account balance in the trust was $80,871.26; as of November 30, 1974, his account balance was $89,519.17; as of November 30, 1975, his account balance was $98,078.34; and upon the trust's termination on

---

[2]Although the record does not clearly demonstrate that the profit-sharing plan was properly "integrated" with social security, the parties have stipulated that the assigned value of social security contributions is properly considered for purposes of comparability of contributions and also have stipulated the value of such social security contributions. The social security contributions represent 7 percent of compensation up to a maximum compensation of $13,200 for 1974, $14,100 for 1975, and $15,300 for 1976.

[3]The parties have stipulated that this pension plan is representative of the various collectively bargained union pension plans which covered all employees of the company other than those covered by the trust at all times relevant to the issues in this case.

[4]The parties' stipulation does not expressly characterize these years as calendar years or fiscal years. On brief, respondent argues that these tables represent calendar years rather than fiscal years, but that cannot be the case. Both the company and the trust were on a fiscal year basis from Dec. 1 through Nov. 30. Also, the parties have stipulated that the company's last contribution to the trust was during the fiscal year *ending* Nov. 30, 1974, and that the increment in value in petitioner's trust balance between Nov. 30, 1974, and July 15, 1976, was due to trust earnings; hence the contribution to his account for 1974 obviously refers to a contribution during the fiscal year *ending* Nov. 30, 1974.

1974

| Employee | (1)<br>Compensation | (2)<br>Contribution to<br>pension plan<br>by employer | (3)<br>Employer contribution<br>providing social<br>security benefits | (4)<br>(3) + (2)<br>(1) |
|---|---|---|---|---|
| | | PROFIT-SHARING PLAN | | |
| A | $33,500.00 | $5,025.29 | $924 | 0.178 |
| B | 23,504.00 | 3,525.73 | 924 | 0.189 |
| C | 11,748.48 | 1,761.64 | 822 | 0.220 |
| D | 10,835.00 | 1,550.51 | 758 | 0.213 |
| | 79,587.48 | 11,863.17 | 3,428 | 0.192 |
| | | SHEET METAL WORKERS PENSION PLAN | | |
| 1 | $21,382.14 | $862.70 | $924 | 0.084 |
| 2 | 20,526.14 | 774.40 | 924 | 0.083 |
| 3 | 19,888.09 | 841.14 | 924 | 0.089 |
| 4 | 19,762.70 | 885.60 | 924 | 0.092 |
| 5 | 19,459.39 | 823.80 | 924 | 0.090 |
| 6 | 19,208.55 | 856.90 | 924 | 0.093 |
| 7 | 19,041.02 | 835.30 | 924 | 0.092 |
| 8 | 19,002.29 | 812.00 | 924 | 0.091 |
| 9 | 18,480.06 | 780.60 | 924 | 0.092 |
| 10 | 18,291.92 | 775.40 | 924 | 0.093 |
| 11 | 18,147.51 | 768.00 | 924 | 0.093 |
| 12 | 17,809.70 | 809.95 | 924 | 0.097 |
| 13 | 17,324.42 | 776.30 | 924 | 0.098 |
| 14 | 16,206.20 | 759.60 | 924 | 0.104 |
| 15 | 12,164.27 | 806.60 | 852 | 0.136 |
| 16 | 10,413.43 | 753.80 | 729 | 0.142 |
| 17 | 8,950.17 | 399.20 | 627 | 0.115 |
| 18 | 8,556.76 | 548.30 | 599 | 0.134 |
| 19 | 6,316.56 | 275.70 | 442 | 0.114 |
| 20 | 4,597.58 | 207.40 | 322 | 0.115 |
| 21 | 4,391.18 | 201.00 | 307 | 0.116 |
| 22 | 4,213.58 | 122.40 | 295 | 0.099 |
| 23 | 4,053.56 | 186.80 | 284 | 0.116 |
| 24 | 3,741.08 | 172.40 | 262 | 0.116 |
| 25 | 3,736.74 | 397.80 | 262 | 0.177 |
| 26 | 3,355.65 | 323.30 | 235 | 0.166 |
| 27 | 1,111.04 | 51.20 | 78 | 0.116 |
| 28 | 944.02 | 31.40 | 66 | 0.103 |
| Totals | 341,075.75 | 15,838.99 | 18,296 | 0.100 |

1975

| | (1) | (2) Contribution to pension plan by employer | (3) Employer contribution providing social security benefits | (4) (3) + (2) (1) |
|---|---|---|---|---|
| Employee | Compensation | | | |
| **PROFIT-SHARING PLAN** | | | | |
| A | $42,349.86 | - - - | $987 | 0.023 |
| B | 38,074.97 | - - - | 987 | 0.026 |
| C | 37,000.00 | - - - | 987 | 0.027 |
| D | 12,329.87 | - - - | 863 | 0.070 |
| | 129,754.70 | - - - | 3,824 | 0.029 |
| **SHEET METAL WORKERS PENSION PLAN** | | | | |
| 1 | $21,696.92 | $871.00 | $987 | 0.086 |
| 2 | 21,402.88 | 870.30 | 987 | 0.087 |
| 3 | 20,906.14 | 813.60 | 987 | 0.086 |
| 4 | 20,766.38 | 810.90 | 987 | 0.087 |
| 5 | 20,704.61 | 786.40 | 987 | 0.086 |
| 6 | 20,546.32 | 796.80 | 987 | 0.087 |
| 7 | 20,379.19 | 770.00 | 987 | 0.086 |
| 8 | 20,369.95 | 832.80 | 987 | 0.089 |
| 9 | 20,351.85 | 805.60 | 987 | 0.088 |
| 10 | 19,800.27 | 825.60 | 987 | 0.092 |
| 11 | 19,515.65 | 797.10 | 987 | 0.091 |
| 12 | 19,310.71 | 764.00 | 987 | 0.091 |
| 13 | 19,200.17 | 759.00 | 987 | 0.091 |
| 14 | 18,689.08 | 705.40 | 987 | 0.091 |
| 15 | 18,193.60 | 738.80 | 987 | 0.095 |
| 16 | 16,793.73 | 632.30 | 987 | 0.096 |
| 17 | 16,117.34 | 668.00 | 987 | 0.103 |
| 18 | 14,228.49 | 676.60 | 987 | 0.117 |
| 19 | 12,705.94 | 745.80 | 889 | 0.129 |
| 20 | 12,509.01 | 829.60 | 876 | 0.136 |
| 21 | 11,394.90 | 432.60 | 798 | 0.108 |
| 22 | 9,906.00 | 797.60 | 693 | 0.150 |
| 23 | 9,630.53 | 390.00 | 674 | 0.110 |
| 24 | 9,134.00 | 369.80 | 639 | 0.110 |
| 25 | 8,417.76 | 343.80 | 589 | 0.111 |
| 26 | 3,985.92 | 153.60 | 279 | 0.109 |
| 27 | 3,556.80 | 144.00 | 249 | 0.110 |
| 28 | 3,028.12 | 122.60 | 212 | 0.110 |
| 29 | 2,833.68 | 110.40 | 198 | 0.109 |
| 30 | 2,200.02 | 198.20 | 154 | 0.160 |
| 31 | 2,167.76 | 136.60 | 152 | 0.133 |
| 32 | 1,852.50 | 75.00 | 130 | 0.111 |
| 33 | 1,758.64 | 71.20 | 123 | 0.110 |
| 34 | 316.18 | 12.80 | 22 | 0.110 |
| 35 | 256.88 | 10.40 | 18 | 0.111 |
| 36 | 256.88 | 10.40 | 18 | 0.111 |
| 37 | 6.68 | 0.60 | - - - | 0.090 |
| Totals | 444,891.48 | 18,879.20 | 24,479 | 0.097 |

1976

| Employee | (1) Compensation | (2) Contribution to pension plan by employer | (3) Employer contribution providing social security benefits | (4) $\frac{(3) + (2)}{(1)}$ |
|---|---|---|---|---|
| PROFIT-SHARING PLAN | | | | |
| A | $22,500.00 | - - - | $1,071 | 0.048 |
| B | 16,252.50 | - - - | 1,071 | 0.066 |
| C | 16,252.50 | - - - | 1,071 | 0.066 |
| D | 8,574.06 | - - - | 600 | 0.070 |
| | 63,579.06 | - - - | 3,813 | 0.060 |
| SHEET METAL WORKERS PENSION PLAN | | | | |
| 1 | $13,982.28 | $538.20 | $979 | 0.109 |
| 2 | 13,975.47 | 596.75 | 978 | 0.113 |
| 3 | 13,681.80 | 548.85 | 958 | 0.110 |
| 4 | 13,653.67 | 560.10 | 956 | 0.111 |
| 5 | 13,551.13 | 558.50 | 949 | 0.111 |
| 6 | 13,550.56 | 549.92 | 949 | 0.111 |
| 7 | 13,455.61 | 479.00 | 942 | 0.106 |
| 8 | 13,093.62 | 527.70 | 917 | 0.110 |
| 9 | 13,030.49 | 518.80 | 912 | 0.110 |
| 10 | 12,946.70 | 523.60 | 906 | 0.110 |
| 11 | 12,610.95 | 497.90 | 883 | 0.110 |
| 12 | 12,327.31 | 493.65 | 863 | 0.110 |
| 13 | 12,065.61 | 504.75 | 845 | 0.112 |
| 14 | 11,588.56 | 463.95 | 811 | 0.110 |
| 15 | 11,431.27 | 475.50 | 800 | 0.112 |
| 16 | 10,889.35 | 461.30 | 762 | 0.112 |
| 17 | 9,693.41 | 516.75 | 679 | 0.123 |
| 18 | 9,254.66 | 540.95 | 648 | 0.128 |
| 19 | 8,475.50 | 341.30 | 593 | 0.110 |
| 20 | 7,085.26 | 499.90 | 496 | 0.141 |
| 21 | 6,181.29 | 238.20 | 433 | 0.109 |
| 22 | 4,609.80 | 192.75 | 323 | 0.112 |
| 23 | 3,057.14 | 226.10 | 214 | 0.144 |
| 24 | 2,914.88 | 150.40 | 204 | 0.122 |
| 25 | 2,302.04 | 93.20 | 161 | 0.110 |
| 26 | 1,951.38 | 175.80 | 137 | 0.160 |
| 27 | 1,763.58 | 71.40 | 123 | 0.110 |
| 28 | 158.08 | 6.40 | 11 | 0.110 |
| Totals | 263,281.40 | 11,351.62 | 18,432 | 0.113 |

July 15, 1976, his account balance was $102,050.24. The increment in value between November 30, 1974, and July 15, 1976, was due to trust earnings.

Upon the trust's termination in 1976, petitioner established an Individual Retirement Account (IRA), with the First National Bank of Ironton acting as the custodian thereunder. Relying upon respondent's ruling of December 23, 1962, and believing the trust to be a qualified trust, petitioner, on July 16, 1976, transferred the entire balance of his trust account ($102,050.24) to the IRA.

On November 16, 1978, respondent issued a final adverse determination letter, retroactively revoking the qualified status of the trust, effective for the tax year of the trust beginning in 1974 (fiscal year 1975). The reasons given for revocation of the trust's qualified status were that the plan failed to satisfy the coverage requirements of section 401(a)(3), and also that discrimination prohibited by section 401(a)(4) existed for the tax year of the trust beginning in 1974 (fiscal year 1975). The parties agree that the trust was a qualified trust in each of its fiscal years beginning in 1962 and ending on November 30, 1973. The parties are in dispute concerning all subsequent years.

By statutory notice of deficiency, dated March 21, 1980, respondent determined that since the qualified status of the trust had been retroactively revoked, the distribution from the trust in 1976 should have been reported as ordinary income and was ineligible for a tax-free rollover into petitioner's IRA. Respondent also determined that petitioner should have reported the $1,850 interest earned by the IRA as taxable income for his calendar year 1976. Finally, because of the above adjustments, respondent increased the amount of petitioner's sales tax deduction allowable in 1976.

OPINION

H.T. Boggs Co., Inc. (hereinafter the company), is engaged in the sheet metal fabricating and roofing business. Most of the employees of the company are union members and have been covered for many years by various union pension plans negotiated for in good faith collective bargaining. On November 12, 1962, the company adopted a profit-sharing plan and trust (hereinafter the trust) covering all full-time salaried

employees with 2 years of service. In December of 1962, the company received a favorable determination from the Commissioner that the trust constituted a qualified trust under section 401(a) and was exempt from tax under section 501(a). The trust continued in operation without any amendment until it was terminated by the company in July of 1976. At that time, petitioner received a distribution from the trust of the total amount credited to his account, $102,050.24. Relying upon the Commissioner's ruling of December 23, 1962, and believing the trust to be a qualified trust, petitioner rolled over the entire amount into an Individual Retirement Account (IRA). However, on November 16, 1978, the Commissioner issued an adverse determination letter retroactively revoking the qualified status of the trust as of its tax year beginning December 1, 1974. The company's last contribution to the trust was during the fiscal year ending November 30, 1974. Petitioner's account in the trust as of November 30, 1974, was $89,519.17.

The primary issue before the Court is whether the distribution to petitioner upon the trust's termination in 1976 is eligible for a tax-free rollover into an IRA. Section 402(a)(5) allows certain distributions from an employee's trust to receive such treatment, but only if the employee's trust is qualified under section 401(a) and exempt from tax under section 501(a). See secs. 402(a)(5)(A)(i) and 402(a)(5)(D)(iii), as amended by Pub. L. 95–458, 92 Stat. 1255, 1258, effective for taxable years beginning after December 31, 1974. Thus, we must first examine the qualified status of the trust before we can determine whether the distribution therefrom may be rolled over tax free under section 402(a)(5), and it is to the qualified status of the trust that the major disputes herein are directed.

Section 401(a) sets out the numerous requirements which must be met before a trust can obtain qualified status. Certain changes in these requirements which were made by the Employee Retirement Income Security Act of 1974 (ERISA) are inapplicable to this case.[5] As they read during the years

---

[5]Both secs. 401(a)(3) and 401(a)(4) were amended by the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93–406, 88 Stat. 829. As amended, sec. 401(a)(3) now merely makes reference to sec. 410, which was added to the Code by sec. 1011 of ERISA, *supra*, 88 Stat. at 898, 900. Secs. 410(b)(1)(A) and 410(b)(1)(B) now contain essentially the same coverage requirements previously imposed by sec. 401(a)(3). However, in applying the coverage requirements, sec. 410(b)(3)(A) now allows certain union employees to be disregarded.

pertinent to this case, sections 401(a)(3) and 401(a)(4) provided that a trust is a qualified trust—

(3) if the trust, or two or more trusts, or the trust or trusts and annuity plan or plans are designated by the employer as constituting parts of a plan intended to qualify under this subsection which benefits either—

(A) 70 percent or more of all the employees, or 80 percent or more of all the employees who are eligible to benefit under the plan if 70 percent or more of all the employees are eligible to benefit under the plan, excluding in each case employees who have been employed not more than a minimum period prescribed by the plan, not exceeding 5 years, employees whose customary employment is for not more than 20 hours in any one week, and employees whose customary employment is for not more than 5 months in any calendar year, or

(B) such employees as qualify under a classification set up by the employer and found by the Secretary or his delegate not to be discriminatory in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees; and

(4) if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees. * * *

In his adverse determination letter, respondent retroactively revoked the qualified status of the trust effective for its tax year beginning in 1974 on the grounds that the trust failed the coverage requirements of section 401(a)(3) and also discriminated in contributions or benefits in favor of the "prohibited group" within the meaning of section 401(a)(4). Respondent asserts that since the trust's qualification had been revoked for the year in which the distribution to petitioner was made, no part of the distribution qualifies for a tax-free rollover under section 402(a)(5). Petitioner, on the other hand, asserts that the trust met the requirements of sections 401(a)(3) and 401(a)(4) at all times, and that the retroactive revocation of the

As amended by sec. 1022(a) of ERISA, *supra*, 88 Stat. at 938–939, persons whose principal duties consist in supervising the work of other employees are now excluded from the prohibited group under sec. 401(a)(4). Moreover, amended sec. 401(a)(4) now allows those persons excluded from the coverage requirements under sec. 410(b)(3)(A) to likewise be excluded from consideration in testing for prohibited discrimination.

However, neither of these amendments aid petitioner herein. Sec. 1017(b) of ERISA, *supra*, 88 Stat. at 932–935, as amended by sec. 402 of the Tax Reduction Act of 1975, Pub. L. 94–12, 89 Stat. 26, 47, provides that with respect to plans in existence on Jan. 1, 1974, the above amendments apply only to plan years beginning after Dec. 31, 1975. The last plan year of the profit-sharing plan in question herein began on Dec. 1, 1975, prior to the above effective date. On brief, both parties have conceded that secs. 401(a)(3) and 401(a)(4), as amended by ERISA, are inapplicable herein.

trust's qualified status was an abuse of respondent's discretion. In the alternative, petitioner asserts that even assuming the trust was not qualified at the time the distribution was made, the portion of his account balance consisting of employer contributions and earnings while the trust was still qualified remains eligible for tax-free rollover treatment under section 402(a)(5). We agree in part with respondent and in part with petitioner.

Section 1.401–3(f), Income Tax Regs., provides, in part, that "An employer may designate several trusts * * * as constituting one plan which is intended to qualify under section 401(a)(3), in which case all such trusts * * * taken as a whole may meet the requirements of such section." The parties have stipulated that the company made such a designation with respect to the trust and the various union plans. When viewed in this light, it is clear that the coverage requirements of section 401(a)(3) were at all times satisfied, since 100 percent of the company's employees were covered under either the trust or one of the union plans. Considered together as a single plan or trust, it readily met the safe-harbor provision of section 401(a)(3)(A), and respondent concedes as much on brief. Further discussion of this point would be superfluous.

However, even though the coverage requirements of section 401(a)(3) are satisfied, the trust must still meet the requirement of section 401(a)(4) that contributions or benefits under the plan not discriminate in favor of the prohibited group— employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees. Since the company has designated the various union plans and the trust herein as one plan intended to qualify under section 401(a)(3) for coverage purposes, we also consider them as one plan in testing for the prohibited discrimination. *E.F. Higgins & Co. v. Commissioner*, 74 T.C. 1029 (1980), affd. without published opinion 661 F.2d 914 (3d Cir. 1981); *Loper Sheet Metal, Inc. v. Commissioner*, 53 T.C. 385 (1969); Rev. Rul. 70–183, 1970–1 C.B. 104, restated by Rev. Rul. 81–5, 1981–1 C.B. 171 for years after the effective date of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93–406, 88 Stat. 829 (1974). Respondent has also conceded this point on brief.

Since the combined plan in question herein is composed of "unlike" plans or trusts—the union pension plan providing defined benefits and the salaried employees' profit-sharing plan providing defined contributions—a comparison of benefits is somewhat akin to comparing apples and oranges. However, the requirements of section 401(a)(4) are satisfied if it can be shown that *either* contributions *or* benefits do not discriminate in favor of the prohibited group. *Loper Sheet Metal, Inc. v. Commissioner*, 53 T.C. at 391; Rev. Rul. 70–183, *supra*, restated in Rev. Rul. 81–5, *supra*. The presence of prohibited discrimination is a factual issue to be determined from all the surrounding facts and circumstances. *E.F. Higgins & Co. v. Commissioner*, 74 T.C. at 1042. In judging the qualification of a plan, we must consider not only its terms but also its operation. See sec. 1.401–1(b)(3), Income Tax Regs.; *Winger's Department Store, Inc. v. Commissioner*, 82 T.C. 869 (1984); *Quality Brands, Inc. v. Commissioner*, 67 T.C. 167, 174–175 (1976), and cases cited therein.

In his attempt to demonstrate that the requirements of section 401(a)(4) were met, petitioner expended little effort in trying to show that the benefits under the combined plan were not discriminatory. In view of the substantial differences in vesting under the two plans, it is possible any such effort would have been wasted. The trust provided for annual vesting at a rate of 10 percent, thus a participating employee was 100 percent vested upon completion of 10 years of service with the company. However, the union plan provided for no vesting until the employee completed at least 15 years of service. While differences in vesting alone may not necessarily make a plan discriminatory within the meaning of section 401(a)(4), it is clear that "Vesting is an important benefit in any pension plan and is one which must be considered in reaching a decision as to whether a plan is discriminatory as to benefits." *United States v. Hall*, 398 F.2d 383, 387 (8th Cir. 1968). See also *Loper Sheet Metal, Inc. v. Commissioner*, 53 T.C. at 393. The presence of any other benefits more favorable to the prohibited group would have readily sustained a finding of discrimination as to benefits. However, neither party really discussed benefits, other than respondent's passing reference to the vesting provisions of the two plans. Instead, petitioner

has attempted to demonstrate that contributions to the combined plan were not discriminatory.

We initially note that respondent's retroactive revocation relates to the trust's tax year beginning in 1974 (fiscal year 1975) and thereafter. The parties have stipulated that the trust was qualified through November 30, 1973, but that all subsequent years are in dispute. The parties' dispute concerning discrimination in contributions centers on the facts relating to the trust's December 1, 1973, to November 30, 1974, tax year (fiscal year 1974). Petitioner asserts that year may not constitute the basis for a finding that the trust had become discriminatory in operation. He contends that since the retroactive revocation became effective only as of the trust's tax year beginning December 1, 1974, the trust's tax year prior to such date may not be considered. Petitioner has cited no authority for excluding the facts in regard to such earlier years from our consideration, nor have we found any. We can discern no reason why we should not examine the operation of the trust in prior tax years to determine whether or not respondent properly revoked the trust's qualified status. How we shall treat the effective date of such revocation is another issue which we will address later.

The parties have furnished the Court no information as to contributions in the period from 1962 up to November 30, 1973. The record shows that the profit-sharing plan for salaried employees was never modified from the date of its approval by the Commissioner in 1962 up through the date of its termination by the company on July 15, 1976. The *nondiscretionary* contributions under that plan in the earlier years, as in fiscal year 1974, should have been 50 percent of the company's profit above $30,000 but not to exceed 15 percent of each covered employee's compensation. The parties have stipulated that the union pension plan in evidence is representative of the various union plans collectively bargained over the years. The contributions under the union plans for the earlier years probably were reasonably comparable to those in fiscal years 1974, 1975, and 1976 which are in the record. While the contributions to the union plans may have been somewhat lower in the earlier years, it is quite unlikely that they were any higher. Thus, there is a great likelihood that contributions for the years 1962 through

November 30, 1973, were reasonably comparable to those contributions shown in the record for fiscal year 1974. The only variable would seem to be the matter of the few changes in the composition of the salaried work force covered by the profit-sharing plan, as stipulated by the parties and as found by the Court. In any event, since the parties have presented information only as to contributions for fiscal year 1974, and since those are the figures discussed by both parties, that is what the Court must consider.

In determining whether contributions under the combined plan were discriminatory for fiscal year 1974, the proper test is to compare the contributions as percentages of the compensation paid to members of the prohibited group as against the rank and file employees. *Loper Sheet Metal, Inc. v. Commissioner*, 53 T.C. at 391; *Liberty Machine Works, Inc. v. Commissioner*, 62 T.C. 621, 632 (1974). Section 401(a)(4) was enacted "to prevent the trust device from being used for the benefit of shareholders, officials, or highly paid employees." H. Rept. 2333, 77th Cong., 1st Sess. (1942), 1942–2 C.B. 372, 450.

Applying this test to the facts before us, it is clear that during the 1974 fiscal year the contributions discriminated in favor of the prohibited group. As shown by the table in our findings, contributions to participants of the trust, all of whom were members of the prohibited group, represented slightly in excess of 19 percent of the year's compensation for such participants. In contrast, contributions to participants in the union plan represented only 10 percent of the year's compensation for such participants. Thus, contributions to members of the prohibited group participating in the trust were nearly double those to participants of the union plan, and it cannot be disputed that such contributions were discriminatory within the meaning of section 401(a)(4).

There is nothing in the record to suggest that the figures for fiscal year 1974 contributions were atypical in any way. Although petitioner argues that any discrimination in contributions was temporary in fiscal 1974 and that somehow fiscal 1974 represented a temporary fluctuation resulting in prohibited discrimination for only that year, petitioner has presented no facts to prove his assertion. The last change in the composition of the salaried work force occurred in 1972 and remained in effect up to the date of termination of the plan on

July 15, 1976. Both parties in their briefs discuss the departure of those two low-salaried (nonprohibited group members) employees at great length. However, it appears to the Court that the analysis of the contributions issue is the same, with or without those two employees, because we are considering the combined plan. Respondent's brief at times obscures that fact by seeming merely to compare the profit-sharing plan (and its 19.2-percent contribution rate) against the union pension plan (and its average 10-percent contribution rate). However, respondent's seeming failure to consider the plans as one plan is more apparent than real, and is just a short-hand way of analyzing the combined plan since, at all times after 1972, the employees covered by the profit-sharing plan were all members of the prohibited group. In 1972, petitioner, an officer and the principal shareholder, was the only salaried employee covered by the profit-sharing plan. In 1973, three supervisory employees became covered and these four individuals were the only covered employees for the remaining life of the plan.

Petitioner argues against the above result, contending that certain participants under the union plan should be considered as "highly compensated employees," which he says is anyone with annual compensation of more than $18,000. Petitioner was apparently the most highly compensated employee ($33,500), and one other salaried employee had a salary higher than the compensation of any of the union employees ($23,504). The other two members of the prohibited group covered by the profit-sharing plan had salaries of some $10,000 and $11,000, which was considerably lower than the compensation of many of the union employees.

In analyzing the contributions issue, respondent, as noted above, looks to the fact that the contributions rate for officers, shareholders, and supervisors, all members of the prohibited group, was 19.2 percent, while that for union employees averaged 10 percent. Petitioner argues for a different approach, saying that since we are considering a combined plan, we should look at all employees under both plans whose compensation is above $18,000 and all employees whose compensation is below $18,000 and, thus analyzed, petitioner says, there would be no discrimination in rates of contribution as follows:

*Comparison of contributions*
*FYE Nov. 30, 1974—*

| (1) | (2) | (3) | (4) |
|---|---|---|---|
| | Contribution to plans by | Employer contribution for social security | (3) + (2) |
| Compensation | employer | benefits | (1) |
| Total for all employees earning more than $18,000 per year | | | |
| $292,777.29 | $20,879.01 | $13,592 | 0.117 |
| Total for all employees earning less than $18,000 per year | | | |
| $127,885.94 | 6,823.15 | 8,132 | 0.116 |

Under petitioner's assumption, the contribution rates, at least for fiscal year 1974, would be 11.7 percent for highly compensated employees and 11.6 percent for all other employees. This approach has some superficial appeal, since all employees appear to be compared by a single standard. However, that approach is seriously flawed in that it considers only one of the four categories of employees within the prohibited group, ignoring officers, shareholders, and supervisors, and it completely disregards the case law in this area.

It is not necessary that discrimination exist in favor of all who might be considered members of the prohibited group. It is enough that discrimination does in fact exist, and that those who benefit from such discrimination are in fact members of the prohibited group. *Auner v. United States*, 440 F.2d 516, 520 (7th Cir. 1971); *Quality Brands, Inc. v. Commissioner*, 67 T.C. at 172; *McMenamy v. Commissioner*, 54 T.C. 1057, 1064 (1970), affd. 442 F.2d 359 (8th Cir. 1971). Contributions to participants of the trust were definitely more favorable, and all participants in the trust were either stockholders, officers, or supervisory employees, regardless of whether they might also be considered highly compensated. Petitioner's approach has been rejected by this and other courts, and we will not

reexamine the issue at this late date.[6]

In a variation of the same argument, petitioner next asserts that even assuming contributions were discriminatory in favor of the prohibited group in fiscal year 1974, such discrimination resulted from unforeseen circumstances. The "unforeseen circumstances" were allegedly the loss in 1972 of two trust participants, who were clerical employees, due to retirement and voluntary severance of employment, respectively, which petitioner contends should excuse such discrimination. See *Lansons, Inc. v. Commissioner*, 69 T.C. 773 (1978), affd. 622 F.2d 774 (5th Cir. 1980); *Sherwood Swan & Co. v. Commissioner*, 42 T.C. 299 (1964), affd. 352 F.2d 306 (9th Cir. 1965); *Ryan School Retirement Trust v. Commissioner*, 24 T.C. 127 (1955). While petitioner's argument seems to be directed more to coverage than to discriminatory contributions, particularly since we are considering a combined plan, we will discuss the argument briefly.

Even though respondent has stipulated that the extent of employee turnover during the years here at issue was beyond the company's control and could not have been anticipated by the company, we do not think the facts of this case present the type of "unforeseen circumstances," which would excuse discriminatory contributions to members of the prohibited group. See note 6. In any event, we are here presented with a

---

[6]Since the profit-sharing plan for salaried employees had a 15-percent basic contribution rate covering all officers, shareholders, and supervisors (whether or not it covered one or two other employees who might not fall within the prohibited group), and since the union plans had an average rate of no higher than the 10 percent for fiscal 1974 and possibly even lower (whether or not some of the union employees possibly could be considered as highly compensated), it would appear to the Court that the profit-sharing plan or the combined plan would be discriminatory in favor of the prohibited group from the outset. This profit-sharing plan seems to fall within the harsh situation this Court has often alluded to in commenting on the difficulty, if not impossibility, for a small company most of whose employees are union members covered by union pension plans to set up a qualified plan for salaried employees, most of whom fall within the prohibited group. See discussion and cases cited in *E.F. Higgins & Co. v. Commissioner*, 74 T.C. 1029 (1980), affd. without published opinion 661 F.2d 914 (3d Cir. 1981). Most of that difficulty has been eliminated prospectively by ERISA, but unfortunately those changes in the law cannot help petitioner. See note 5. Here, for whatever reason, the Commissioner initially approved the profit-sharing plan and trust as qualified under sec. 401(a) and exempt from tax under sec. 501(a), and this Court cannot and will not second-guess the Commissioner's action in that regard. It may well be that the later revocation of that qualified status reflected less a matter of change in the operation of the plan than a greater sensitivity to and awareness of respondent's litigating successes in this area by the time the company notified the Commissioner of the termination of the plan. The revocation strikes the Court as somewhat akin to an attempt to close the barn door after the horse has trotted off. Be that as it may, the Court is called upon to decide whether or not the trust was qualified and in determining qualification vel non, the Court will follow the settled case law of this and other courts.

change in the composition of the company's work force and the effect of such change was rendered permanent by the trust's termination during its 1976 taxable year. Furthermore, the claimed unforeseen circumstances that allegedly caused the trust to become discriminatory in operation occurred during its 1972 taxable year, and yet no action (such as limiting the contributions rate to that under the union plan) was taken by the company to prevent such changes from rendering the trust discriminatory in operation. *Pulver Roofing Co. v. Commissioner*, 70 T.C. 1001, 1008–1014 (1978). We do not think petitioner can avoid the consequences resulting from the trust's discriminatory contributions by asserting "unforeseen circumstances" as the cause thereof.

Since the Court has found that the trust discriminated in contributions in favor of the prohibited group within the meaning of section 401(a)(4) and thus was not qualified under section 401(a), it is clear that respondent could properly revoke the trust's qualified status. We next consider petitioner's argument that respondent abused his discretion in revoking the trust's qualified status retroactively. Of course, at that point petitioner had already terminated the trust and prospective revocation would have been a meaningless act. In any event, we cannot find an abuse of discretion here.

It is clear that respondent has the statutory authority to revoke a ruling retroactively. Sec. 7805(b). We will not disturb respondent's decision to make the revocation retroactive unless he has abused his discretion. *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180 (1957). Respondent has announced that a ruling will not, in the absence of rare and unusual circumstances, be revoked retroactively if certain conditions are met. Statement of Procedural Rules, 26 C.F.R. sec. 601.201(1)(5) (1976).[7] Among the numerous conditions

---

[7] 26 C.F.R. sec. 601.201(1)(5) provides, in part, that:

"Except in rare or unusual circumstances, the revocation or modification of a ruling will not be applied retroactively with respect to the taxpayer to whom the ruling was originally issued or to a taxpayer whose tax liability was directly involved in such ruling if (i) there has been no misstatement or omission of material facts, (ii) the facts subsequently developed are not materially different from the facts on which the ruling was based, (iii) there has been no change in the applicable law, (iv) the ruling was originally issued with respect to a prospective or proposed transaction, and (v) the taxpayer directly involved in the ruling acted in good faith in reliance upon the ruling and the retroactive revocation would be to his detriment. To illustrate, the tax liability of each employee covered by a ruling relating to a pension plan of an employer is directly involved in such ruling. * * *"

imposed by the procedural regulation is that there be no material change in the facts upon which the prior ruling was based. Petitioner has clearly failed to satisfy this condition. The composition of the participants in the trust did change from that extant when respondent issued his favorable ruling in 1962. We cannot say respondent abused his discretion by retroactively revoking the trust's qualified status.

Having concluded that the trust was disqualified and that respondent properly revoked its qualification under section 401(a) and its tax-exempt status under section 501(a), we have returned to the question originally presented by this case: What effect does loss of the trust's qualified status prior to the distribution to petitioner have on petitioner's eligibility to "rollover" such distribution tax free into an IRA under section 402(a)(5)? Respondent's position is that only distributions from "qualified trusts" (sec. 402(a)(5)(A)(i)), qualify for rollover treatment, and that the definition of qualified trust found in section 402(a)(5)(D)(iii) requires that the trust be qualified at the time distribution is made. Thus, respondent asserts no part of the distribution is eligible for section 402(a)(5) treatment and must all be treated as ordinary income under section 402(b) in the year of distribution, 1976.

In our recent Court-reviewed opinion in *Baetens v. Commissioner*, 82 T.C. 152 (1984), on appeal (6th Cir., July 3, 1984), we rejected this same contention by respondent that it is the qualified status of the trust solely at the time the distribution is made that determines the availability of section 402(a)(5) rollover treatment. Instead, we concluded that the benefits of qualification attach on a year-by-year basis rather than just in the year of distribution. Thus, we held in *Baetens* that it is the status of the trust as qualified or nonqualified at the time the contributions thereto are made that determines whether any portion of an employee's account balance is eligible for a tax-free rollover under section 402(a)(5) upon distribution. See also *Benbow v. Commissioner*, 82 T.C. 941 (1984). That portion representing contributions made to the trust while qualified is eligible for section 402(a)(5) treatment, assuming all other requirements of that section are met; that portion represent-

---

See also Rev. Proc. 67–1, 1967–1 C.B. 544; Rev. Proc. 72–3, 1972–1 C.B. 698; Rev. Proc. 80–24, 1980–1 C.B. 658.

ing contributions made to the trust while nonqualified is not, instead being subject to tax in the year of distribution pursuant to the provisions of section 402(b).

Here respondent revoked the trust's qualified status for its tax year beginning December 1, 1974. The record does not indicate why respondent chose that date. Any change in operative facts occurred no later than 1972 and it appears to the Court that the trust's qualified status might properly have been revoked even earlier. See note 6. Respondent's brief suggests that the retroactive revocation date was somehow related to the expiration of the statute of limitations, presumably the limitations period for the company's deduction of contributions to the trust. For whatever reason, respondent chose that retroactive revocation date, and the Court will not permit respondent at this time to go behind that decision to petitioner's detriment.

In this case, the last contribution the company made to the trust was made during the fiscal year ending on November 30, 1974. Therefore, we hold that all company contributions to petitioner's trust account (and any earnings thereon) up to November 30, 1974, are eligible for a tax-free rollover under section 402(a)(5). The balance in petitioner's trust account as of November 30, 1974, was $89,519.17, and that amount may properly be rolled over tax free into his IRA.

This brings us to the problem of how the portion of petitioner's account balance reflecting earnings of the trust in fiscal years 1975 and 1976 should be treated. In each of the trust's 1975 and 1976 taxable years, earnings of the trust served to increase the balance credited to petitioner's account ($102,050.24 − $89,519.17 = $12,531.07). We have not previously addressed the treatment of the earnings portion of a distribution from a once qualified trust that had lost such status prior to distribution.[8] However, we believe the principles enunciated in previous cases concerning employer contributions are equally applicable to trust earnings. As we said in *Benbow v. Commissioner, supra,* and in *Baetens v. Commission-*

---

[8]See Judge Chabot's dissenting opinion in *Woodson v. Commissioner,* 73 T.C. 779, 786, 791 (1980), where it was suggested that the majority opinion therein could possibly be interpreted as allowing some part of the earnings of the trust generated after loss of exempt status to also receive the favorable treatment available to pre-disqualification employer contributions. We do not read the majority opinion that way.

*er, supra,* the benefits of qualification attach on a year-by-year basis. With respect to trust earnings, as with employer contributions, the controlling factor is whether the trust was qualified or nonqualified for the year in which such earnings were generated. *Greenwald v. Commissioner,* 366 F.2d 538 (2d Cir. 1966), affg. in part, revg. in part 44 T.C. 137 (1965). Therefore, under the facts of our case, no part of the trust's earnings generated in its fiscal year 1975 or 1976 is eligible for section 402(a)(5) treatment, since we have concluded herein that the trust was not qualified in those years. The $12,531.07 earnings are taxable under section 402(b). *Greenwald v. Commissioner,* 366 F.2d at 541.

We must next decide whether petitioner should have reported the $1,850 of interest earned by his IRA during 1976 as taxable income, as asserted by respondent in his notice of deficiency. Respondent has not clearly articulated the basis for his position, but we surmise it is somehow dependent upon respondent's position that the funds used to open petitioner's IRA were not eligible for a tax-free rollover under section 402(a)(5). However, the fact that petitioner must pay a tax on a portion of the distribution to him in 1976 does not lead to the conclusion that interest earned on such funds after their deposit into an IRA is also subject to tax.

Normally, an IRA is exempt from income taxation. Sec. 408(e)(1). However, an IRA remains subject to tax on its unrelated business taxable income. See secs. 408(e)(1), 511, 513. Further, an IRA can lose its exempt status under certain prescribed circumstances. Sec. 408(e)(1) and (2). None of the circumstances which would render an otherwise valid IRA subject to income tax is present in this case.

Section 408(a) describes how an IRA is created. Generally, an individual must organize a U.S. trust for his or his beneficiary's exclusive benefit, and the trust instrument must comply with numerous requirements listed in the statute. Sec. 408(a)(1) through (7), inclusive. Among these is the requirement that the trust instrument provide that, except for certain rollover contributions, "contributions will not be accepted for the taxable year in excess of $1,500 on behalf of any individual."[9] The instrument creating petitioner's IRA met all of the

---

[9]The contributions limitation was increased to $2,000 for taxable years beginning after Dec. 31, 1981, by sec. 311(g)(1)(A) of the Economic Recovery Tax Act of 1981, Pub. L. 97–34, 95 Stat. 172, 281.

statutory requirements. Once such requirements are met, a valid IRA is created regardless of the subsequent tax treatment of the account. *Benbow v. Commissioner, supra; Orzechowski v. Commissioner*, 69 T.C. 750, 755 (1978), affd. 592 F.2d 677 (2d Cir. 1979).

However, even though the trust instrument provided otherwise, petitioner's IRA did accept some "excess contributions" for his 1976 taxable year. The $12,531.07 representing trust earnings subsequent to the loss of the trust's exempt status, since not a rollover contribution under section 402(a)(5), remained subject to the $1,500 contribution limit effective for 1976. But this fact does not render petitioner's IRA invalid so as to be subject to tax. We point out that in *Orzechowski v. Commissioner, supra* at 756, the entire amount used to open the IRA in question constituted an "excess contribution" and not just a portion of the transfer, as herein. See also *Benbow v. Commissioner, supra.*

Congress has provided other sanctions for the misuse of IRA's. In particular, section 4973 imposes an annual excise tax of 6 percent of the amount of the excess contributions to an IRA.[10] Moreover, as we held in *Orzechowski v. Commissioner, supra* at 755–756, and in *Benbow v. Commissioner, supra*, relevant legislative history clearly supports our conclusion that such excise tax was intended as the sanction for excess contributions, not invalidation of the IRA in question. Finally, respondent's own regulations also take the position that the excise tax under section 4973 is the penalty to be imposed for an IRA's acceptance and retention of excess contributions. Sec. 1.408–1(c)(1), Income Tax Regs.[11] In light of the above, respondent's position that the interest earned by petitioner's IRA is taxable is not well taken.[12]

To reflect the foregoing,.

*Decision will be entered under Rule 155.*

---

[10]Since respondent has not sought to impose this excise tax against petitioner, we merely note its existence and do not determine petitioner's liability thereunder. See, however, *Benbow v. Commissioner*, 82 T.C. 941 (1984).

[11]Although this regulation was not issued in final form until Aug. 7, 1980, T.D. 7714, 1980–2 C.B. 83, respondent has not exercised his authority to provide for only prospective application. Sec. 7805(b). See also sec. 301.7805–1(b), Proced. & Admin. Regs. We will therefore give full retroactive force and effect to the regulation.

[12]The final issue presented concerns the amount of petitioner's allowable sales tax deduction.

---

Since our decision herein serves to increase petitioner's taxable income, his allowable sales tax
deduction is also to be increased by the proper amount.